IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DEAN KARCH, on his own behalf
and on behalf of all others similarly
situated,

      Plaintiff,

vs.                                                                  No. **CIV-05-620 MCA/LFG**

**CITY OF ALBUQUERQUE,**
a municipal corporation,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Majority Plaintiffs' Motion for Designation as Class Counsel* [Doc. 34], filed December 14, 2005 and Plaintiff's *Motion and Memorandum in Support for Conditional Certification and Court-Facilitated Notice to Similarly-Situated Employees* [Doc. 40], filed December 22, 2005. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court denies the Motion for Conditional Certification and denies as moot the Motion for Designation as Class Counsel.

### I. BACKGROUND

On June 3, 2005, Plaintiff Dean Karch, pursuant to the Fair Labor Standards Act ("FLSA"), filed a *Collective Action Complaint (29 U.S.C. § 216(b))* against the City of Albuquerque. [See generally Doc. 1]. In his *Complaint*, Karch alleges that the City has (1) failed to satisfy the FLSA's salary basis test (Count I); (2) improperly misclassified

members of this collective action as exempt, in violation of the FLSA (Count II); and (3) failed to pay overtime compensation to non-exempt members of this collective action (Count III). [Id. at 4-5].

Karch is a Lieutenant with the Metropolitan Detention Center, which is run jointly by the City and the County of Bernalillo, New Mexico. He alleges that the City has misclassified him as exempt under the FLSA when his "compensation and duties are such that he should be classified as 'non-exempt.'" [Id. at 1]. Karch contends that over the past three years, he has routinely worked more than 40 hours a week but that, as a result of the City's misclassification, he has been denied the overtime pay to which he is entitled under the FLSA. [Id.].

Karch, an employee in the bargaining unit of the M-Series Union, AFSCME Local 3022 ("the M-Series bargaining unit" or "bargaining unit"), brings this action as a collective action on behalf of himself and a class representing all bargaining unit employees who have been misclassified as exempt. [Id. at 3; see also Doc. 51, "Notice of Clarification"]. Karch submits that there also exists a class of employees who have been classified as non-exempt but who nevertheless have been denied overtime pay to which they are entitled, and estimates the proposed class at over 700 current and former City employees.[1] As relief, Karch seeks damages for all overtime work performed but not compensated as required by

---

[1] At the time he filed his *Complaint*, 14 other City employees had filed "Consent to Join" Notices. Those employees hold or held the following various job titles: Family Development Specialist, Head Teacher, Transit Supervisor, Golf Course Superintendent, Supervisor, and Case Management Employee. [Doc. 1 at 2].

2

the FLSA, as well as injunctive relief prohibiting the City from further violating the FLSA. [Id. at 3].

On December 22, 2005, Karch filed his *Motion and Memorandum in Support for Conditional Certification and Court-Facilitated Notice to Similarly-Situated Employees* by which he seeks the conditional certification of a class of all current and former M-Series bargaining unit employees who were either misclassified as exempt under the FLSA and, consequently, denied overtime compensation, or, though classified as non-exempt, were nonetheless denied overtime compensation, and who worked for the City from June 3, 2002 to the present. [See Doc. 40 at 1]. The City opposes certification on the ground that "the class sought to be certified is not appropriate for purposes of the FLSA." [Doc. 58 at 1]. Alternatively, the City has proposed a potential class of employees "about whom [it] believes there could be a reasonable dispute as to their classifications." [Id. at 18].

## II. ANALYSIS

### A. *Motion and Memorandum in Support for Conditional Certification and Court-Facilitated Notice to Similarly-Situated Employees* [Doc. 40]

The FLSA provides, in pertinent part, that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Section 207's mandate does not, however, apply to "any employee employed in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1).

Pursuant to § 29 U.S.C. § 216(b), one or more employees may pursue an action in a representative capacity for other similarly situated employees. 29 U.S.C. § 216(b). Potential class members who are similarly situated to the named plaintiff "opt in" to the case. See id. ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). While district courts are authorized to send notice to potential class members in a collective action brought pursuant to § 216(b), see Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989), this authority must be exercised with discretion and only in appropriate cases. Haynes v. Singer Co., Inc., 696 F.2d 884, 886 (11th Cir. 1983)

The FLSA does not define the term "similarly situated." However, the Tenth Circuit endorses an *ad hoc* approach to determining whether plaintiffs are similarly situated for purposes of § 216(b). Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1105 (10th Cir. 2001). Under this approach, the district court typically makes an initial "notice stage" determination of whether plaintiffs are similarly situated, "requir[ing] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan . . . ." Id. at 1102 (*quoting* Vaszlavik v. Storage Tech. Corp., 175 F.R.D. 672, 678 (D.Colo.1997)). The standard for certification at this stage is a lenient one. Williams v. Sprint/United Mgmt. Co., 222 F.R.D. 483, 485 (D.Kan. 2004). Additionally, because the Court making a "notice stage" determination usually has minimal evidence, a representative class is usually conditionally certified. See Gieseke v. First Horizon Home

Loan Corp., 408 F.Supp.2d 1164, 1166 (D.Kan. 2006). The Court typically makes its " "notice stage" determination fairly early in the litigation, before the parties complete discovery, and does not reach the merits of the plaintiff's claims. Gieseke, 408 F.Supp.2d at 1166.

"At the conclusion of discovery (often prompted by a motion to decertify), the Court then makes a second determination, utilizing a stricter standard of 'similarly situated.'" Thiessen, 267 F.3d at 1102-03. During its "second stage" analysis, the Court reviews several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) whether plaintiffs made the filings required by the [FLSA] before instituting suit." Id. at 1103. The stricter standard applies at this stage because the Court possesses much more information on which to base its decision that the plaintiffs are or are not "similarly situated." Morisky v. Pub. Serv. Elec. and Gas Co., 111 F.Supp.2d 493, 497 (D.N.J. 2000). "If the [C]ourt finds the plaintiffs are similarly situat[ed], the case is allowed to proceed to trial as a collective action." Id.

There may be instances, however, when it is not entirely clear whether the "notice stage" or the "second stage" analysis applies. Such was the situation in Gieseke and Morisky. In Gieseke, plaintiffs' motion for certification reached the district court after the parties had engaged in discovery relating to policies and procedures and the duties and responsibilities of the opt-in plaintiffs; plaintiffs had taken depositions; and defendants had

produced almost 6,000 documents, including personnel files, time sheets, pay records, policies and procedures, job descriptions, organizational charts, compensation plans, memos reflecting disciplinary and management functions assumed by team leads, e-mails and memos related to plaintiffs' compensation and exempt/non-exempt classification, and computer log-in and log-out records. Gieseke, 408 F.Supp.2d at 1166-67. Still, the district court determined that the "notice stage" analysis was appropriate under the circumstances, since (1) the parties' discovery was limited; (2) the evidence before the court was not extensive; (3) the parties' scheduling order contemplated that the case would proceed pursuant to the two-step approach; and (4) the court was unable to conclude that the evidence before it was representative of what plaintiffs would present given further discovery. Id. at 1167. In short, the court in Gieseke determined that employing the "notice stage" analysis was the more equitable approach, as some potential plaintiffs would likely not have become aware of the lawsuit and would have missed an opportunity to opt in were the court to have bypassed the "notice stage" determination. Id.

By contrast, the court in Morisky did bypass the "notice stage" analysis and proceeded directly to the stricter "second stage" analysis. Morisky, 111 F.Supp.2d at 497. The Morisky court reasoned that the stricter standard was applicable because over 100 potential plaintiffs had already opted in to the litigation and because discovery was to have been completed "well before" the motion for certification was filed. Id. at 497-498; see also Holt v. Rite Aid Corp., 333 F.Supp.2d 1265, 1274 (M.D.Ala. 2004) (applying "second

stage" analysis because discovery had been conducted and, therefore, it was proper to examine all the evidence, including that presented by defendant) and Gonzales v. Family Dollar Stores, Inc., No. CIV 03-535 JH/LFG (Memo.Op. and Order entered June 21, 2005) at 6 (analyzing "similarly situated" under stricter standard and declining to rely just on affidavits supporting plaintiffs' position, since case was before Court "with the parties having had the full benefit of discovery").

In this case, discovery has been conducted. [See Doc. 20, "Initial Pretrial Report" (setting January 6, 2006 as termination date for discovery); see also Doc. 29, "Order Extending Deadlines" (extending termination of discovery until February 6, 2006)]. Indeed, discovery was completed the day Karch filed his Reply. As a result, the Court currently has before it more than just minimal evidence. The evidence before the Court includes, among other things, affidavits, depositions, lists of M-Series bargaining unit employees, documents relating to the City's internal audit concerning exempt/non-exempt job classifications, and job descriptions.[2] Also, since the December 22, 2005 filing of the Motion for Conditional

---

[2] As an exhibit to its Response to Karch's Motion for Conditional Certification, the City has attached job descriptions for the following positions in the following departments: Case Management Specialist (Corrections/Detention); Community Recreation Center Supervisor (Community Services/Housing); Community Services Program Coordinator (Community Services/Housing); Corrections Captain, (Protective Services); Corrections Lieutenant (Protective Services); Family Development Specialist (Community Services/Housing); Golf Course Supervisor (Recreation/Parks); Head Teacher (Community Services/Housing); Horticulturist (Cultural Services); Senior Administrative Assistant (Administrative Services); Solid Waste Code Inspector (Refuse Collection); Teacher (Community Services/Housing); Traffic Program Assistant (Transit); Training Specialist (General Management); Transit Supervisor (Transit); Transit Supervisor Maintenance (Transit). The City also provided job descriptions for various Librarian and Forensics positions. [See "Exhibits in Support of

7

Certification, at which point 47 individuals had already opted in to the litigation, at least 15 more potential plaintiffs have filed "Notices of Consent" to join the action. [See Docs. 50, 54, 60, 62, 67, 70, 71, 74-78]. Accordingly, the Court concludes that it is appropriate to apply the stricter, "second stage" analysis. In so doing, the Court determines that Karch has not met his burden of demonstrating that he and the opt-in plaintiffs are similarly situated.

Karch contends that he and the opt-in plaintiffs—whether they were misclassified as exempt or properly classified as exempt but nonetheless denied overtime compensation—are similarly situated because they did not receive the overtime pay to which they maintain they were entitled. [Doc. 40 at 3, 25 (defining class as "[a]ll current and former 'M-Series' employees of the City of Albuquerque ('City') who were either (1) classified as 'Exempt' under the FLSA or (2) who, although classified 'Nonexempt,' were nonetheless deprived of overtime pay . . . .")]. What Karch and the opt-in plaintiffs really are challenging, at least with respect to those individuals who allege they were misclassified as exempt, is the City's determination that they are or were exempt under the FLSA. [See Doc. 63 at 8, "Simply put, it is Plaintiff's position that *all* employees who should be part of this litigation are non-exempt, despite the City's misclassification of some of these employees." (emphasis in original)]. The issue was the same in Morisky, which prompted that court to explain that

> [t]o determine which employees are entitled to overtime compensation under the FSLA [sic] depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria. Therefore,

Defendant City of Albuquerque's Response;" Exhs. 2-H, 2-I, 2-J].

> "similarly situated" in this case must be analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt.

Morisky, 111 F.Supp2d at 498. As another district court—also faced with a certification motion of an employee claiming to have been erroneously classified as exempt—reasoned, "[d]etermining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing administrative duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'" Mike v. Safeco Ins. Co. of Am., 274 F.Supp.2d 216, 220 (D.Conn. 2003) (*quoting* Cooke v. General Dynamics Corp., 993 F.Supp. 56, 59-61 (D.Conn.1997)).

In the present case, as of the time the Motion for Conditional Certification was filed, 47 individuals representing 7 different City departments and 13 different job classifications had opted in to the litigation. [Doc. 40 at 2-3]. Since the filing of that motion, at least 15 more potential plaintiffs have filed "Notices of Consent" to join the action. [See Docs. 50, 54, 60, 62, 67, 70, 71, 74-78]. The class that Karch seeks to certify consists of the employees listed in Exhibit A1; in other words, M-Series bargaining unit members. [See Doc. 40 at 5]. As reflected in Exhibit A1, there are nearly 1,000 M-Series bargaining unit employees, with hundreds of job classifications, who are employed in 18 different City departments. [Exh. 42; Exh. A1]. Where, as here, the ultimate issue to be determined is whether each employee was properly classified as exempt, the question of whether they were "similarly situated" must be analyzed in terms of the nature of the job duties performed by

9

each employee. Morisky, 111 F.Supp.2d at 498.

In this case, Karch has not shown that his job responsibilities are the same or similar to those of the opt-in plaintiffs. Instead, he has cited City ordinances and regulations authorizing the creation of a classification plan based on the duties and responsibilities of City-service positions as proof that the City itself has determined that M-Series employees are similarly situated. [See Doc. 40 at 19]. He also has directed the Court to cases[3] wherein courts have conditionally certified classes that included different job classifications. [Doc. 40 at 22-23; Doc. 63 at 5]. However, none of those cases involved the issue presented here, *to wit*, whether the plaintiff-employees were erroneously classified as exempt in the first place.

The City, on the other hand, has submitted a sampling of job descriptions[4] that highlight the many dissimilarities between and among the various positions held by the potential plaintiffs in this action. [See "Exhibits in Support of Defendant City of Albuquerque's Response;" Exh. 2-H]. The job description for Lieutenant in the City's

---

[3] Those cases are Realite v. Ark Restaurants Corp., 7 F.Supp.2d 303 (S.D.N.Y. 1998); Garza v. Chicago Transit Auth., 2001 WL 503036 (N.D. Ill. May 8, 2001); and Moss v. Crawford & Co., 201 F.R.D. 398 (W.D. Pa. 2000).

[4] In the City's Response, there is a reference to an electronic link, located at http://alameda.cabq.gov/cityapps/HRDPosSpecsCopyforLegal.nsf/626E6035EADBB4CD852564 99006B15A6, which is described as containing "[a]ll of the approved job descriptions" and having been "specifically created for this litigation." [Doc. 58 at 5, ¶ 30]. This electronic link was also referenced by Karch in his Reply. [Doc. 63 at 2 (not disputing creation of link)]. It was unclear to the Court whether the data in the link was to be considered by the Court in its resolution of the pending motions. The Court has not accessed the electronic link or viewed the material contained therein and has therefore not considered that material in determining the issues now before it.

Protective Services Department, for example, includes but is not limited to the following essential functions: *supervising, assigning, reviewing, and participating in the work of staff responsible for activities and operations of a correctional program; assisting in the selection, training, motivation, and evaluation of correctional services personnel; coordinating the transportation of residents to and from department facilities and monitoring and supervising the security of residents outside of detention facilities; explaining, justifying, and defending division programs, policies, and activities and negotiating and resolving sensitive and controversial issues as necessary; staying abreast of new trends and innovations in the field of corrections, criminology, social work, or related fields; and performing correction officer duties and responsibilities in emergency situations*. Additionally, the minimum educational and experience requirements for the position of Lieutenant include an associate's degree in criminal justice or a related field, plus four years' experience as a correction officer, with one year as a Sergeant with the Bernalillo Country Metropolitan Detention Center. ["Exhibits in Support of Defendant City of Albuquerque's Response;" Exh. 2-H, job description for Corrections Lieutenant].

By contrast, the job description for a Golf Course Supervisor in the City's Parks and Recreation Department includes but is not limited to the following essential functions: *coordinating the organization, staffing, and operational activities of an assigned golf course; reviewing daily expenditures necessary for the operation of an assigned golf course; maintaining reports on all inventory and equipment, and directing the purchase of*

11

*equipment and materials; supervising chemical and pesticide applications of golf course turf; participating in the design of irrigation systems and landscaping and supervising irrigation system maintenance; participating in the development and administration of an assigned budget; forecasting funds needed for staffing equipment, materials, and supplies; monitoring and approving expenditures, and recommending adjustments as necessary; and preparing and presenting staff reports and other correspondence.* Additionally, the minimum educational and experience requirements for the position of Golf Course Supervisor include an associate's degree from an accredited college or university with major coursework in park management, recreation agronomy, or related field, plus four years' experience in golf course maintenance and operations, with one year direct supervisory or technical lead in an administrative capacity. ["Exhibits in Support of Defendant City of Albuquerque's Response;" Exh. 2-H, job description for Golf Course Supervisor].

Finally, by way of example, the job description for a Transit Supervisor in the City's Transit Department includes but is not limited to the following essential functions: *coordinating the organization, staffing, and operational activities for assigned motor coach operations and services; directing, coordinating, and reviewing the work plan for assigned motor coach transit services; participating in the development, revision, and timing of new and established routes; maintaining records on daily motor coach routes; selecting, training, motivating, and evaluating motor coach personnel; and responding to and investigating a variety of emergencies, accidents, and other related incidents.* Additionally,

12

the minimum educational and experience requirements for the position of Transit Supervisor include an associate's degree in business or a related field or a two-year certificate in business or a related field, plus five years' motor coach/transit operations experience, including one year of direct supervisory or technical lead experience in an administrative capacity. ["Exhibits in Support of Defendant City of Albuquerque's Response;" Exh. 2-H, job description for Transit Supervisor].

Lieutenant, Golf Course Supervisor, and Transit Supervisor all are job classifications held by City employees whom Karch purports to represent. [See Doc. 40 at 2-3]. The duties specified in these job classifications represent a nonexhaustive list of the essential functions contemplated by these positions, which, in turn, represent just three out of approximately 192 job classifications that Karch contends are "similarly situated." This small sampling alone reveals a wide variety of job duties. Additionally, the record evidence reveals that it is possible for the same position to be exempt for one employee and non-exempt for another, depending on the precise nature of the work those two employees are performing. [See "Exhibits in Support of Defendant City of Albuquerque's Response;" Exh. 2-G, Sept. 16, 2002 email from Chris Roybal of the Department of Labor to City representative Vivian Sanchez (explaining that, as among a number of employees in the same department and with the same classification, some may be classified as exempt and others as non-exempt depending on whether they are actually performing the duties described in the job description or, in the case of an administrator or professional, doing primarily non-exempt

13

work because of staff shortages, and further stating that exempt status is normally determined on a week-by-week basis)].

In addition to the fact that Karch has failed to demonstrate that he is "similarly situated" to the opt-in plaintiffs, this Court concludes that, under the circumstances, a collective action would not be an efficient means of resolving the parties' dispute. See Hoffmann-La Roche Inc., 493 U.S. at 170 (explaining that, in a collective action, "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact . . . ."). That is because "[t]he exempt or non-exempt status of potentially hundreds of employees would need to be determined on a job-by-job, or more likely, an employee-by-employee basis." Morisky, 111 F.Supp.2d at 499. And, as previously explained, determining whether an employee is exempt involves an extremely individual and fact-intensive inquiry, requiring both a detailed analysis of the time spent performing administrative duties and a careful factual analysis of the full range of the employee's job duties and responsibilities. Mike, 274 F.Supp.2d at 220; see also 29 CFR § 541.700(a) (explaining that determination of an employee's "primary duty," which, in turn, determines exempt status, requires consideration of, among other things, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee). For this additional reason, the Court

concludes that this action should not proceed as a collective action.

### B. Majority *Plaintiffs' Motion for Designation as Class Counsel* [Doc. 34]

Because the Court declines to certify this action as a collective action, the Court will deny as moot Majority *Plaintiffs' Motion for Designation as Class Counsel* [Doc. 34].

### III. CONCLUSION

For the reasons stated above, the Court concludes that this action is not an appropriate one to proceed as a collective action. Consequently, the Court will deny Plaintiff's *Motion and Memorandum in Support for Conditional Certification and Court-Facilitated Notice to Similarly-Situated Employees*. *Majority Plaintiffs' Motion for Designation as Class Counsel* will be denied as moot.

**IT IS, THEREFORE, ORDERED** that Plaintiff's *Motion and Memorandum in Support for Conditional Certification and Court-Facilitated Notice to Similarly-Situated Employees* [Doc. 40] is **DENIED**.

**IT IS FURTHER ORDERED** that *Majority Plaintiffs' Motion for Designation as Class Counsel* [Doc. 34] is **DENIED AS MOOT.**

**SO ORDERED** this 8th day of May, 2006, in Albuquerque, New Mexico.

                                                    **M. CHRISTINA ARMIJO**
                                                    United States District Judge