IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**DEAN KARCH, et al.**,

       Plaintiff,

vs.                               No. **CIV-05-620 MCA/LFG**

**CITY OF ALBUQUERQUE,**
**a municipal corporation,**

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion for Summary Judgment* [Doc. 155], filed March 9, 2007.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion in part and denies the motion in part.

## I. BACKGROUND

In this Fair Labor Standards Act (FLSA) action, Plaintiffs are current and former employees of Defendant City of Albuquerque who contend that they were misclassified as exempt and therefore erroneously denied overtime wages due them under the applicable provisions of the FLSA.  [See generally Doc. 137].  Partial settlement has reduced what began as an extensive assortment of employees in myriad positions and departments throughout the City to a much smaller group consisting of one Golf Course Supervisor, Corrections Lieutenants, and Corrections Captains.  [See Docs. 153, 168].  The City now

moves for summary judgment on the ground that Plaintiffs are exempt from the FLSA's overtime provisions because (1) Plaintiffs are and were executive employees; and (2) irrefutable evidence establishes that Plaintiffs' primary duties were to manage their respective institutions.  [See Doc. 156 at 13; Doc. 167 at 2].

## II. ANALYSIS

### A. The Standard for Summary Judgment

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324.

It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the nonmoving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the nonmoving party, and draws all reasonable inferences in the nonmoving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B. The Fair Labor Standards Act

The Fair Labor Standards Act provides, in pertinent part, that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Section 207's mandate does not, however, apply to "any employee employed in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1). Accompanying regulations define "executive employee" as one

> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and

> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. §541.100(a).  Exemptions to the FLSA are to be narrowly construed and the employer must show its employees fit "plainly and unmistakenly within [the exemption's] terms."  Reich v. State of Wyo., 993 F.2d 739, 741 (10th Cir. 1993) (*quoting* Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)).  In other words, "[a]n employer must prove that the employee is exempt by 'clear and affirmative' evidence."  Aaron v. City of Wichita, Kan., 54 F.3d 652, 657 (10th Cir. 1995) (*quoting* Donovan v. United Video, Inc., 725 F.2d 577, 581 (10th Cir.1984)).

"Determining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing administrative duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'"  Mike v. Safeco Ins. Co. of Am., 274 F.Supp.2d 216, 220 (D. Conn. 2003) (*quoting* Cooke v. General Dynamics Corp., 993 F.Supp. 56, 59-61 (D. Conn.1997)); Bohn v. Park City Group, Inc., 94 F.3d 1457, 1461 (10th Cir. 1996) ("[T]he inquiry into exempt status . . . remains intensely fact bound and case specific.").  For purposes of the instant motion, Plaintiffs contend that the City has failed to satisfy its summary-judgment burden of showing the nonexistence of genuine material factual issues as to whether (1) their primary duties involved management; and (2) they had authority to hire or fire other employees.  [See Doc. 160 at 11 ("For purposes of this motion, the elements of the 29 CFR

4

541.100 test which Plaintiffs contest are the second and fourth requirements.")].

### 1. The "Primary Duty" Test

Both the regulations and case law provide guidance meant to assist in determining

when an employee's primary duty involves management.  Management activities include,

but are not limited to,

> [i]nterviewing, selecting, and training . . . employees; setting
> and adjusting their rates of pay and hours of work; directing
> their work; . . . appraising their productivity and efficiency for
> the purpose of recommending promotions or other changes in
> their status; handling their complaints and grievances and
> disciplining them when necessary; planning the work;
> determining the techniques to be used; apportioning the work
> among the workers; determining the type of materials, supplies,
> machinery or tools to be used or merchandise to be bought,
> stocked and sold; controlling the flow and distribution of
> materials or merchandise and supplies; providing for the safety
> of the men and the property.

Dep't of Labor v. City of Sapulpa, Okl., 30 F.3d 1285, 1287 (10th Cir. 1994) (*quoting* 29

C.F.R. § 102).  The regulations go on to explain that the amount of time spent performing

exempt work can be a useful guide in determining whether exempt work is the primary duty

of an employee; therefore, an employee who spends more than 50 percent of his or her time

performing exempt work will generally satisfy the "primary duty" requirement.  29 C.F.R.

§ 541.700(b); City of Sapulpa, Okl., 30 F.3d at 1287 ("A fact-sensitive inquiry is necessary,

but in the ordinary case it may be taken as a good rule of thumb that primary duty means the

major part, or over 50 percent, of the employee's time.") (internal quotation omitted).  Still,

the regulations caution that "[t]ime alone . . . is not the sole test, and nothing in [29 C.F.R.

§541.700] requires that exempt employees spend more than 50 percent of their time performing exempt work."  29 C.F.R. § 541.700(b).  Indeed, as the Tenth Circuit has explained, "'the employee's primary duty will usually be what [he] does that is of principal value to the employer, not the collateral tasks that [he] may also perform, even if they consume more than half [his] time.'"  Bohn, 94 F.3d at 1461 (*quoting* Dalheim v. KDFW-TV, 918 F.2d 1220, 1227 (5th Cir.1990)).  In making the "primary duty" determination, courts focus on evidence regarding the employee's actual, day-to-day activities rather than more general job descriptions included in resumes and position descriptions.  Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 400 (6th Cir. 2004).

The inability of the employer to establish that the employee spends (or spent) more than 50 percent of his or her time on management activities is not fatal to its claim of exempt status, however, because the Court must still consider four other factors.  Those factors are (1) the relative importance of the managerial duties as compared with other types of duties; (2) the frequency with which the employee exercises discretionary powers; (3) the employee's relative freedom from supervision; and (4) the relationship between his or her salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.  Hays v. City of Pauls Valley, 74 F.3d 1002, 1007 (10th Cir. 1996).

With respect to element (3), it bears noting that the exercise of discretionary power is different from the use of skill.  The regulations governing administrative employees

elaborate on the term "exercise of discretion."[1]  Section 541.202 provides, in pertinent part,

that

> [t]he exercise of discretion and independent judgment implies
> that the employee has authority to make an independent choice,
> free from immediate direction or supervision. However,
> employees can exercise discretion and independent judgment
> even if their decisions or recommendations are reviewed at a
> higher level. Thus, the term "discretion and independent
> judgment" does not require that the decisions made by an
> employee have a finality that goes with unlimited authority and
> a complete absence of review. The decisions made as a result of
> the exercise of discretion and independent judgment may
> consist of recommendations for action rather than the actual
> taking of action. The fact that an employee's decision may be
> subject to review and that upon occasion the decisions are
> revised or reversed after review does not mean that the
> employee is not exercising discretion and independent
> judgment. For example, the policies formulated by the credit
> manager of a large corporation may be subject to review by
> higher company officials who may approve or disapprove these
> policies. The management consultant who has made a study of
> the operations of a business and who has drawn a proposed
> change in organization may have the plan reviewed or revised
> by superiors before it is submitted to the client.

29 C.F.R. § 541.202(c).  That an employee can exercise discretion and still be subject to

higher review should be considered in conjunction with the observation that

> [p]erhaps the most frequent cause of misapplication of the term
> "discretion and independent judgment" is the failure to
> distinguish it from the use of skill in various respects. An
> employee who merely applies his knowledge in following
> prescribed procedures or determining which procedure to

---

[1]  The Court recognizes that the City claims that Plaintiffs are executive—not
administrative—employees.  Nevertheless, the Court believes that the regulation defining
"exercise of discretion" for purposes of administrative employees is instructive here.

> follow, or who determines whether specified standards are met
> or whether an object falls into one or another of a number of
> definite grades, classes, or other categories, with or without the
> use of testing or measuring devices, is not exercising discretion
> and independent judgment within the meaning of [the
> regulations]. This is true even if there is some leeway in
> reaching a conclusion, as when an acceptable standard includes
> a range or a tolerance above or below a specific standard.[2]

Schaefer, 358 F.3d at 404 (*quoting* 29 C.F.R. § 541.207(c)(2)).  Armed with this fuller

understanding of the FLSA, the Court now turns to the particular facts of—and employees

involved in—this case.  Also, because the City does not appear to argue that Plaintiffs spend

or spent more than 50 percent of their time on management activities, the Court turns directly

to the "four other factors" analysis set forth in Hays and described above.

### a. The Position of Golf Course Supervisor

Plaintiff Amalia Gallegos is employed with the City's Parks and Recreation

Department as a Golf Course Supervisor at the Puerto Del Sol Golf Course.  When asked at

her deposition if "there [is] anybody higher than you at your golf course[,]" Ms. Gallegos

responded that there is not, although an acting superintendent oversees all City golf courses.

According to Ms. Gallegos, however, the acting superintendent visits her at her golf course

only periodically.  Ms. Gallegos, who works with a staff of five, testified that she delegates

work to her employees, hands out schedules, and rotates job assignments.  She further

testified that she conducts job interviews, evaluates her subordinates, and issues letters of

---

[2] See also 29 C.F.R. § 541.202(e) ("The exercise of discretion and independent judgment
must be more than the use of skill in applying well-established techniques, procedures or specific
standards described in manuals or other sources.").

instruction.[3]  [Doc. 156; Exh. A, Amalia Gallegos depo. at 3, 8-13].

Ms. Gallegos also explained, however, that her job duties include mowing the golf course grass, raking sand traps, changing ball cups, servicing ball washers, moving tee markers, picking up trash, digging holes, irrigating, inspecting the golf course, and making necessary repairs.   [Doc. 156; Exh. A, A. Gallegos depo. at 8-11, 18].   Although Ms. Gallegos holds a state certification that allows her to apply such chemicals as fungicides, herbicides, insecticides, and fertilizers, and supervises her employees' application of those chemicals, she testified that it is the golf course superintendent who determines the application schedule.   [Id. at 6-7, 14].   Ms. Gallegos also testified that while she works from a budget, she neither prepares nor makes recommendations for that budget.   According to Ms. Gallegos, her requests for equipment[4] often go unmet and it is the golf course supervisor who decides what tools she will receive.   [Id. at 16-18].   Since 1993, Ms. Gallegos has hired one person, and her sole recommendation for termination was "shot . . . down."   [Id. at 12-13].

In light of the above-described deposition testimony, this Court finds that the existence of material factual issues as to Ms. Gallegos's primary duties precludes the entry

---

[3]  According to a number of plaintiffs in this action, letters of instruction do not constitute discipline.  [See Doc. 156; Exh. 4, Affidavit of Robert Candelaria; see also Exh. H, Roy Hartman depo. at 14 (explaining that a letter of instruction states the issue and how it can be corrected and warns that if the wrongful conduct continues, disciplinary measures will be taken); and Exh. I, Dean Karch depo. at 11 (explaining that a letter of instruction does not constitute discipline)].

[4]  Ms. Gallegos testified that the tools she uses in her job include mowers, hand tools, irrigation and equipment parts, rails, bed knives, sand pros, deck mowers, edgers, hedgers, weed eaters, and "a lot of maintenance tools."  [Doc. 156; Exh. A, Gallegos depo. at 16].

of summary judgment for the City.  Given the amount of physical labor that Ms. Gallegos clearly performs, the Court cannot say as a matter of law that these duties are less important than the managerial duties that arguably also are a part of her job.  Similarly, the frequency with which Ms. Gallegos exercises discretionary powers has not been established, and while she testified that her supervisor visits her only periodically, she also testified that it is the supervisor who makes such decisions as when chemicals will be applied to the golf course and what pieces of equipment Ms. Gallegos will receive.  Finally, the City presented no evidence regarding the relationship between Ms. Gallegos's salary and the wages paid other employees for the kind of nonexempt work performed by Ms. Gallegos.  See Hays, 74 F.3d at 1007.  Consequently, the Court concludes that, in Ms. Gallegos's case, the City has not satisfied its heavy burden of demonstrating by clear and affirmative evidence that her primary duties involve management activities, such that she plainly and unmistakenly comes within the FLSA's executive exemption.[5]

---

[5]  That the evidence at this stage of the proceedings is insufficient to demonstrate Ms. Gallegos's exempt status does not mean that, as a general rule, golf course employees are never exempt.  See Hays, 74 F.3d at 1007 (affirming district court's denial of golf course manager's motion for judgment notwithstanding the verdict/new trial following jury's determination that manager was exempt, and specifically holding that manager, who spent more than 50 percent of his time on nonmanual, management tasks, satisfied "primary duty" test).  Moreover, the summary-judgment evidence tends to show—and Ms. Gallegos confirmed— that the United States Department of Labor deems her a bona fide executive. [See Doc. 156; Exh. A, Gallegos depo. at 21; Doc. 167; Exh. K-1].  At this point, however, the Court cannot determine as a matter of law Ms. Gallegos's exempt or nonexempt status.

**b. The Position of Corrections Lieutenant**

A number of plaintiffs in this action are, or at the relevant times were, Corrections Lieutenants with the Metropolitan Detention Center (MDC).[6]  Although the applicable job description submitted by the City lists the position title as "Corrections Lieutenant," all deposed Plaintiffs who serve or served as such further identified themselves as—or testified as to the duties of—Booking Lieutenant, Unit Lieutenant, Transport Lieutenant, Training Lieutenant, Civil Litigations Lieutenant, ACA Monitor/Coordinator Lieutenant, and/or Shift Commander.  The duties, obligations, and responsibilities of a sampling of these Lieutenant positions are discussed below.

**1. Booking and Transport Lieutenants**

Booking Lieutenants oversee the booking and release and discharge of inmates. [Doc. 156; Exh. F,  Matthew Candelaria depo. at 6; Exh. H, Roy Hartman depo. at 49.]. They evaluate Corrections Officers (COs), but neither promote employees nor make recommendations regarding promotions.  [Id.; Exh. G, W. Bell depo. at 25]. Booking Lieutenants supervise a civilian staff of 10 to 15 workers, sign off on releases, and ensure that all pertinent documentation is correct.  [Id.; Exh. H, R. Hartman depo. at 49]. Notwithstanding, at least one Plaintiff who served as Booking Lieutenant described the position as "a hands-on job" involving "doing pat searches . . . escorting people . . . doing room searches . . . doing patting down . . . taking paperwork upstairs, taking inmates, getting

---

[6] Defendant City operated the MDC until July 1, 2006, when Bernalillo County assumed control.

11

their blankets, everything they need . . . ." [Id.; Exh. J, Tommy Trujillo depo. at 18].[7]  The

position of Transport Lieutenant similarly was described as a hands-on position involving

taking inmates to such places as court and medical facilities.  [Id.; Exh. F, M. Candelaria

depo. at 10].  Plaintiff Tommy Trujillo confirmed that "[t]he point of the Transport Unit is

to maintain security at court, transport inmates to court and back to the main facility.

Basically, that was it, throughout the day, back and forth to court."  [Id.; Exh. J, T. Trujillo

depo. at 7].    Notwithstanding Plaintiff Trujillo's description, Harry Tipton, retired

Corrections Department Director, explained that the Transport Lieutenant "is more

autonomous than other lieutenants because his or her duty assignment is off-site."  [Id.; Exh.

C, Affidavit of Harry Tipton at 3].  To be sure, the credible testimony reveals that Transport

Lieutenants are responsible for the daily  transportation of as many as 200 or 300 inmates

by bus, van, and car.  [Id.; Exh. F, M. Candelaria depo. at 23].

## 2. Unit Lieutenants

All Plaintiffs who serve or served as Unit Lieutenants testified as to their experience

and duties performed in that position.  Plaintiff Will Bell, who no longer works for the City,

testified that, as Unit Lieutenant, he "[m]anaged a certain unit, manag[ed] the COs [and] was

directly in charge of the COs and the inmates, and all report writing that—incidents that

---

[7]  Additionally, when asked whether, as Booking Lieutenant, he exercised discretion over
how the booking unit was operated, Plaintiff Will Bell explained that he implemented, though
did not write, "a lot of procedures."  [Doc. 156; Exh. G, W. Bell depo. at 25].  What this
response reveals about the discretion Plaintiff Bell actually enjoyed as Booking Lieutenant is
unclear but, as more thoroughly explained above in Section II.B.1., Schaeffer cautions against
interchanging the terms "exercise of discretion" and "use of skill" for purposes of the FLSA.
See Schaeffer, 358 F.3d at 404.

happened on that shift." [Doc. 156; Exh. G, Will Bell depo. at 15]. He also testified, as did Plaintiffs Matthew Candelaria, Tommy Trujillo, Roy Hartman, and Dean Karch, that the authority of a Unit Lieutenant to discipline employees is limited. [Id.]. According to Plaintiff Bell, he could issue oral reprimands and counselings, but that any form of discipline higher than a letter of reprimand was "out of [his] hands" and had to be handled by a Captain. [Id. at 15-17]. Plaintiff Candelaria, now a Captain, similarly explained that as a Unit Lieutenant, he could impose "the lowest level [of discipline], like a verbal, a counseling," but could not issue a sanction in the form of a letter of instruction or caution or order an employee to take time off. According to Plaintiff Candelaria, he would prepare a packet for forwarding to and investigation by the Internal Affairs Department. [Id.; Exh. F, M. Candelaria depo. at 13]. Plaintiff Trujillo, now an Internal Affairs/Civil Litigation Lieutenant stated that, as a Unit Lieutenant, he could not, absent a Captain's permission, issue letters of instruction, caution, or reprimand. [Id.; Exh. J, T. Trujillo depo. at 23, 28-29].

In contrast to the testimony of Plaintiffs Candelaria and Trujillo, Plaintiff Hartman explained that, while he can issue a letter of caution, "[a] a letter of caution isn't quite disciplinary." [Id.; Exh. H, R. Hartman depo. at 14]. He further explained that he is authorized to issue a letter of instruction, which is lower than a letter of caution and states the issue and how the issue can be corrected and warns that further infractions "will proceed higher." [Id.]. Finally, Plaintiff Dean Karch testified that he can issue letters of instruction, which do not constitute discipline, but cannot discipline or reprimand his employees without

a Captain's permission.  [Id.; Exh. I, Dean Karch depo. at 10-11].

There also was differing testimony as to Unit Lieutenants' authority to discipline inmates.  Plaintiff Trujillo, for example, testified that he could not write up inmates, [Doc. 156; Exh. J, T. Trujillo depo. at 22], while Plaintiff Candelaria testified that he would initiate the inmate disciplinary process by issuing a letter of investigation.  [Id.; Exh. F, M. Candelaria depo. at 14-16].  However, Plaintiff Candelaria also described the process as "automatic" and stated that "officers are instructed and trained that any [inmate] violation . . . ha[s] to be written up."  [Id. at 16, 31].  Plaintiff Bell similarly testified to the seemingly formulaic nature of writing inmate incident reports, explaining that "you did not put in any report, writing, your thoughts.  You put only the facts . . . ."  [Id.; Exh. G, W. Bell depo. at 17].

Plaintiffs also testified as to the manner in which they were supervised and their decisions reviewed.  According to Plaintiff Trujillo, he was required to call his Captain "for every little thing[,]" further explaining that "[a]ny decisions you'd basically make, you had to get ahold of the captain."  [Doc. 156; Exh. J, T. Trujillo depo. at 11].  He also stated that he made no decisions with regard to how his shift was operated.  [Id. at 17].  When Plaintiff Karch was asked whether, as Lieutenant, he exercised ultimate authority over his unit, he responded, "Never.  The captains oversaw everything."  [Id.; Exh. I, D. Karch depo. at 9].  Plaintiff Karch also testified that Captains were on site "a lot," although usually not 24 hours a day.  [Id. at 10].  Explaining that the duties of a Lieutenant differ depending on what shift—day, swing, or grave—that Lieutenant is working, Plaintiff Bell stated that when he

14

worked the day shift, he "had a captain on site all the time."[8]    [Id.; Exh. G, W. Bell depo. at 46].  While Plaintiff Bell also testified that his immediate supervisor (*i.e.*, his Shift Commander) did not overrule actions he took as Unit Lieutenant, Plaintiff Karch testified that certain of his actions were changed "all the time."  [Id.; Exh. G, W. Bell depo. at 31; Exh. I, D. Karch depo. at 46].  For example, Plaintiff Karch was asked whether he evaluated his COs:

> Q: Do you evaluate your COs?
> A: Yes.
> Q: And how do you do that?
> A: We have to do an evaluation form.  And then before it's submitted, the captains have to sign off on it.
> Q: Have you ever had a captain change your evaluation?
> A: *All the time.*

[Doc. 156; Exh. G, D. Karch depo. at 24-25 (emphasis added)].  On the issue of authority to hire, Plaintiff Trujillo explained that he made no hiring decisions, although he has conducted interviews.[9]  [Id.; Exh. J, T. Trujillo depo. at 14-15].

---

[8]  Plaintiff Bell also testified, however, that when he worked in MDC's Delta Unit, his Captain was never on site.  [Doc. 156; Exh. G, W. Bell depo. at 27].  This apparent discrepancy might be explained by the deposition testimony of Captain Craig Fossett that Captains were not assigned to the grave or swing shift but, instead, were on call if needed.  [Id.; Exh. E, Craig Fossett depo. at 21].

[9]  When asked whether he made hiring recommendations, however, Plaintiff's Trujillo's response was somewhat unclear:

> Q: Did you make recommendations for hiring?
> A: No. Well, basically, you ask them the questions, and you put a score on there, how you felt—everybody felt they were—presented themselves and everything. So it was a one through five score, one through five, and that's it. That's all you did.

[Doc. 156; Exh. J, T. Trujillo depo. at 15].

### 3. Shift Commanders

There can be no real doubt that, of the various Lieutenant positions discussed here, Shift Commanders enjoy the greatest authority.  Shift Commanders "oversee the entire operation of the shift."  [Doc. 156; Exh. F, M. Candelaria depo. at 9; <u>see also</u> Exh. G, W. Bell depo. at 13 (confirming that, as Shift Commander "[y]ou were in charge of the whole, entire shift."); Exh. D. Charisse Cook depo. at 5-6 (explaining that when she was Shift Commander, she "was the one that was in charge for the time being.")].  They (1) review rosters, (2) ensure correct staffing, (3) give briefings, (4) update staff, (5) assign staff to their posts, and (6) complete paperwork.  Shift Commanders also respond to and report on emergencies.  [<u>Id.</u>; Exh. G, W. Bell depo. at 11-12; Exh. H, R. Hartman depo. at 33-34].  Shift Commanders do more office work than other Lieutenants, and they track sick leave and approve and deny vacation time.  Also, because the "primary objective for shift commander is staffing[,]" Shift Commanders ensure the presence of adequate staff and call in employees to work overtime.  [<u>Id.</u>; Exh. H, R. Hartman depo. at 34].  Shift Commanders also complete one unit check per shift, "making sure the lieutenants and sergeants there are doing . . . what they're supposed to do."  [<u>Id.</u> at 36].

That Shift Commanders have greater authority than other Lieutenants, however, does not mean they have unfettered authority.[10]  Plaintiff Bell, for example, testified that, although

---

[10]  On the other hand, the fact that Shift Commanders also may be subject to supervision by their superiors is not necessarily dispositive at the summary-judgment stage of whether Shift Commanders are or are not exempt employees.  For one thing, the extent of an employee's freedom from supervision is just one of four <u>Hays</u> factors that the Court must consider.  For another, the question of an employee's freedom from supervision is one of relativity and, as

as Shift Commander, he never met with his Captain, his Captain "always exercise[d] supervision . . . [t]ell[ing Bell] what he wants, what he wants done." [Doc. 156; Exh. G, W. Bell depo. at 44, 48]. He also explained that Shift Commanders "have to notify [Captains] of every situation that is pertinent in the guidelines of the policy of the MDC . . . ." [Id. at 20]. While Plaintiff Bell testified that he did not believe a Captain had ever overruled a decision he made as Shift Commander, he also explained that Captains can direct Shift Commanders to handle incidents a certain way. [Id. at 21 ("You just give [the Captain] the input of what's going on and your solution of what you're doing. Then, if that's not appropriate, then they tell you, "Well, do this, this, and this.'")]. Moreover, Shift Commanders perform their duties in accordance with a policy and procedure manual they follow. [Id. at 44].

In light of the foregoing discussion of the many duties, obligations, and responsibilities of the various Lieutenant positions, the Court concludes that material factual issues exist as to the relative importance of Lieutenants' managerial duties, as compared with the other types of "hands-on" duties they must perform. See Bohn, 94 F.3d at 1461. Additionally, although the deposition testimony reveals that all Lieutenants—even Shift Commanders—are subject to some level of supervision, the precise extent of this supervision remains a question of fact. Finally, given evidence that (1) Booking Lieutenants implement,

_____

such, uniquely suitable (at least in this case) to a jury's determination. See Hays, 74 F.3d at 1007 (explaining that when employer does not show that employee spends more than 50 percent of his or her time on managerial activities and, thus, the Court must consider the four additional factors, one of those factors is "the employee's *relative* freedom from supervision" (emphasis added)).

but do not create, procedures; (2) Unit Lieutenants follow an "automatic" process in the event of an inmate incident and are instructed and trained that any violation must be reported; and (3) even Shift Commanders follow a policy and procedure manual, there exist material factual issues as to how much discretion Lieutenants actually exercise. <u>See</u> <u>Schaefer</u>, 358 F.3d at 404 (differentiating "exercise of discretion" and "use of skill"). In other words, the evidence at this stage of the proceedings remains too fact-laden to permit the Court to determine the Corrections Lieutenants' exempt or nonexempt status as a matter of law. For this reason, the City's summary-judgment motion will be denied with respect to the  Corrections Lieutenants. <u>See</u> <u>McGrath v. City of Philadelphia</u>, 864 F.Supp. 466, 489 (E.D.Pa. 1994) (denying City of Philadelphia's summary-judgment motion on issue of police department commanders' status as executive employees because Court could not determine from summary-judgment record each commander's relative freedom from supervision or relative importance of their managerial duties as compared with other activities).

### c. The Position of Corrections Captain

The City's job description for the position of Corrections Captain states that their responsibility is "[t]o direct, manage, supervise, and coordinate assigned programs and activities within an assigned unit of the Corrections Center; to ensure enforcement of applicable  policies, procedures and regulations; and to provide highly responsible and complex administrative support to an assigned Corrections Major." [Doc. 156; Exh. B-2, "Captain Job Description" at 1].  Plaintiffs Matthew Candelaria, Charisse Cook, and Craig Fossett testified as to their duties as Corrections Captains, and their testimony reveals that

the primary duties of Corrections Captains involve direction, management, and supervision.

Plaintiff Candelaria stated that the difference between Captains and Lieutenants is accountability.  [Doc. 156; Exh. F, M. Candelaria depo. at 31].  He explained that the Captain in charge of the Transport Unit, for example, oversees the unit; determines the need for additional staff and/or additional equipment; and addresses safety concerns.  In short, the Captain makes "[a]ll decisions making sure that everything is run properly."  [Id. at 17]. Plaintiff Candelaria also testified that Captains are responsible for ensuring that inmate and staff policies and standards are followed.  [Id. at 31].

Plaintiff Cook, the only deposed Captain who runs the police academy, testified that, in that position, her duties include evaluating subordinates; providing training and creating the training curriculum; and recruiting.  [Id.; Exh. D, C. Cook depo. at 20, 24, 26].  She explained that, as a member of the panel that reviews academy applicants, she signs off on potential recruits, the names of whom are then sent on for "the ultimate review."  [Id. at 21]. Plaintiff Cook estimated that approximately 50 percent of her recruitment decisions are overruled.  She cannot approve overtime at the academy.  [Id. at 26].  Although she answers to a deputy chief and the Chief of Corrections, neither is housed at the academy, making Plaintiff Cook the on-site officer in charge of the academy.  [Id. at 22-23].

In addition to running the academy, Plaintiff Cook also currently runs the MDC's "D" Unit.  In that capacity, she oversees the staffing of the unit and ensures that her employees do what they are supposed to do.  Plaintiff Cook has authority to reassign officers in her unit and is also in charge of the food service area and laundry.  [Id.; Exh. D, C. Cook depo. at

33, 35-36].  She cannot impose discipline, though she can issue letters of caution.  She

described the role she plays in the disciplinary process of employees once she has received

a report from one of her Lieutenants:

> All they [the Lieutenants] do is supply the evidence in reference
> to if they violated or if they didn't, or what happened.  And then
> when the captain gets it, the captain goes through it again and
> basically sees if any policies were violated.  *And then you would
> forward it over to your boss for determination, because the
> captains don't even make a recommendation.*

[Id. at 39-40 (emphasis added)].  According to Plaintiff Cook, Captains are consulted by

Shift Commanders when Shift Commanders are unable to resolve issues that arise.  Captains

also "have to come in, and . . . deal with" situations such as hostile transports, inmate

assaults, and inmate rapes.  [Id. at 19-20].

Plaintiff Cook also detailed some of her supervisory duties as Captain overseeing a

Unit.  She explained that she expected the Lieutenant or Sergeant running the shift

> [t]o do their pod checks, go and check each pod, making sure
> that the officers are doing what they're supposed to do, you
> know, making sure that the inmates are up and making their
> beds or making sure they're getting fed on time, making sure
> the pod is clean, you know, just these everyday responsibilities.

[Id.; Exh. D, C. Cook depo. at 33].  She makes sure the correct officers are working in the

correct areas, determines which officers will work which areas, and reassigns them if

necessary.  [Id. at 35].  She does the same on food service.

Craig Fossett retired as a Captain from the MDC in 2006.  During his tenure as an

MDC Captain, Plaintiff Fossett ran such units as Segregation, Medical, and Transportation.

He also was in charge of the Community Corrections Program.  Before he was promoted to Captain, Plaintiff Fossett served as Upgrade Captain, meaning he was doing the work of a Captain but receiving the pay of a Lieutenant.  As Upgrade Captain, Plaintiff Fossett reviewed reports, resolved issues that arose with staff, conducted mediation hearings, attended Captains' meetings, and attended judges' meetings.  [Doc. 156; Exh. E, C. Fossett depo. at 7].

As on-call Captain working the swing or night shift, Plaintiff Fossett estimated that he received an average of three calls a day from his subordinates.  [Doc. 156; Exh. E, C. Fossett depo. at 21-22].  He testified that as both Upgrade Captain and Captain, he was the highest level individual on staff while at work; nevertheless, he still was required to report to a Major.  [Id. at 7].  Although Plaintiff Fossett had authority to overrule his subordinates, his Major had similar authority over Plaintiff Fossett.  Indeed, when asked if he was routinely overruled or if he had "the final call," Plaintiff Fossett replied, "Well, I had the final call if I was aware of it.  However, oftentimes the major makes a decision and then tells me what he did, whether I agreed with it or not.  I mean, he has that authority to override me or make the decision over me."  [Id. at 26-27].  Plaintiff Fossett also testified that while he could submit recommendations as to the staffing of his unit, "[u]ltimately, any decisions that I ma[de], honestly, went up to above me, and they could change at any given moment."  [Id. at 34].  In Plaintiff Fossett's words, "[t]he corrections department works really well, because anyone above me can change anything I say or do."  [Id. at 30].

Notwithstanding the fact that he was supervised, the evidence also demonstrates that

Plaintiff Fossett made and implemented decisions. For example, he testified that he attended meetings on inmate bond issues and then implemented recommendations made during those meetings. [Doc. 156; Exh. E, C. Fossett depo. at 35-36]. Plaintiff Fossett also testified that he attempted to solve problems raised by judges during the judges' meetings he attended. [Id. at 34-35]. As for disciplinary authority, Plaintiff Fossett testified that he could reprimand, though he could not impose time off. [Id. at 40]. Plaintiff Fossett also explained that he recommended certain officer removals while at the MDC and that his recommendations were accepted and followed.

On the basis of the foregoing, the Court concludes that the overall primary duties of Corrections Captains involve management and supervision. For example, Corrections Captains with responsibility for a particular unit ensure proper and adequate staffing, assign officers to their posts, and are authorized to overrule decisions of the subordinates. They are the highest level officers on site and, when not on site, must be available on an on-call basis for consultation with lower level officers. Corrections Captains also (1) make sure that inmate and staff policies and standards are followed; (2) determine the need for additional staff and/or additional equipment; and (3) address safety concerns. In short, they ensure that the facility is run correctly. In her capacity as Captain in charge of the police academy, Plaintiff Cook evaluates subordinates, provides training and creates the training curriculum, and recruits applicants. In her capacity as Captain in charge of running a unit, Plaintiff Cook makes sure the correct officers are working in the correct areas, determines which officers will work which areas, and reassigns them if necessary.

Before Plaintiff Fossett retired from his position as a Corrections Captains, his duties included reviewing reports; resolving issues that arose with staff; conducting mediation hearings, and attending Captains' meetings, judges' meetings, and meetings on inmate bond issues. He attempted to solve problems raised by judges in the judges' meetings he attended and made decisions and implemented decisions made during bond meetings. Plaintiff Fossett reprimanded and also successfully recommended certain officer removals. Thus, because a review of the record evidence persuades the Court that Corrections Captains' principal value to the City is as managers and supervisors, the Court concludes that these employees are properly classified as exempt. Accordingly, the City's motion for summary judgment will be granted with respect to the Corrections Captains.

## III. CONCLUSION

Because there remain material factual issues in this matter with respect to the primary duties of Golf Course Supervisor Amalia Gallegos, as well as the Corrections Lieutenants, the City's motion for summary judgment will be denied as to those Plaintiffs. Because the Court concludes that Corrections Captains are properly classified as exempt, the motion is granted as to them.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** with respect to Golf Course Supervisor Amalia Gallegos;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to those Plaintiffs whose claims relate to their position as Corrections Lieutenant;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Dean Karch;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Elizabeth Aguilar;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Will M. Bell, Jr.;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Matt Candelaria to the extent that this Plaintiff's claims relate to his position as Corrections Lieutenant;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Robert Candelaria;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff John J. Chimento;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Charisse Cook to the extent that this Plaintiff's claims relate to her position as Corrections Lieutenant;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Patrick D. Cordova;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Donald L. Davis;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Rosario Falbo;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Craig Fossett  to the extent that this Plaintiff's claims relate to his position as Corrections Lieutenant;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Roy F. Hartman;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Eddie Hogan;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Mary Ann Jackson-Robinson;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Marie F. Lucero;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Douglas Robinson;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Rhinda Roque;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Grant K. St. Clair;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment*

[Doc. 155] is **DENIED** as to Plaintiff Jonathan D. Thomas;

      **IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Tommy Trujillo;

      **IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **DENIED** as to Plaintiff Frank Valdez;

      **IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **GRANTED** as to those Plaintiffs whose claims relate to their position as Corrections Captains;

      **IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **GRANTED** with respect to Plaintiff Matt Candelaria to the extent that this Plaintiff's claims relate to his position as Corrections Captain;

      **IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **GRANTED** with respect to Plaintiff Charisse Cook to the extent that this Plaintiff's claims relate to her position as Corrections Captain;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 155] is **GRANTED** with respect to Plaintiff Craig Fossett to the extent that this Plaintiff's claims relate to his position as Corrections Captain;

**SO ORDERED** this 3rd day of May, 2007, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge